**Frank V. SNYDER, Jr. by Teresa L. SNYDER, his Legal Guardian, Petitioner–Appellant,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent–Appellee.**

No. 97–5018.

United States Court of Appeals, Federal Circuit.

June 20, 1997.

**546**

Boyd A. England, England & Young, P.C., Doylestown, PA, for petitioner–appellant.

Vincent Matanoski, Attorney, Torts Branch, Civil Division, Department of Justice, Washington, DC, for respondent–appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, and John Lodge Euler, Deputy Director.

Before NEWMAN, CLEVENGER, and BRYSON, Circuit Judges.

CLEVENGER, Circuit Judge.

Frank V. Snyder, Jr., by his legal guardian, Theresa L. Snyder, appeals from the decision of the United States Court of Federal Claims sustaining the special master's dismissal of her petition for compensation brought under the National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa–1 to 300aa–34 (1994)) (Act). We affirm.

### I

Under the Act, a prima facie case of entitlement to compensation is made when the petitioner establishes that a person has:

    sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with [a] vaccine ... and the first symptom or manifestation of the on-

set or of the significant aggravation of any such illness, disability, injury, or condition ... occurred within the time period after vaccine administration set forth in the Vaccine Injury Table....

42 U.S.C. § 300aa–11(c)(1)(C)(i) (1994). The Act establishes encephalopathy as a Table Injury, and sets three days (72 hours) as the time period for the first symptom or manifestation. The issue in this case is whether the facts show that Frank suffered the first symptom of an encephalopathy within 72 hours from his third DPT vaccination shot.

### II

Frank Snyder received his third DPT vaccination shot on December 30, 1957—almost 40 years ago—when he was six months old. According to testimony given by his mother and father before the special master, within 72 hours of the third shot, Frank suffered the first symptom or manifestation of the onset on an encephalopathy. Frank's parents described him as a healthy, happy baby having achieved normal developmental milestones in his first six months. They also described Frank's loss of certain of those milestones, his 103 ° F temperature, his crying in a high pitched screech, and his blank stare, all within 72 hours from the third shot. The special master noted that the parents' recollection of the events following the shot was extremely particular and detailed. The parents stated that they reported Frank's post-shot conditions to the doctor who had administered the shot. The doctor, according to Frank's parents, prescribed a medicine to alleviate Frank's condition, but otherwise assured the parents that Frank's condition was "par for the course" and that the parents need not worry.

The special master also heard testimony from Frank's cousin, who when 16 years old was a regular baby-sitter in the Snyder household. She testified that she noticed a great change in Frank's facial expressions just after the third shot. In particular, she recalled Frank's vacant and blank stare, compared to his jolly disposition before the shot. She testified, however, that she did not mention the significant change in Frank's appearance to his parents at that time, be-

cause she did not think it appropriate for a 16 year old baby sitter to tell the parents about such a fact. She testified further that she had discussed the change in Frank's behavior with the Snyders in connection with preparation for the Vaccine Act petition, but that she did not recall the timing of that conversation.

The doctor who administered the third DPT shot is retired and has disposed of all his medical records. He recalls that at the time of Frank's birth, the family and its children were his patients. He assumes that he gave Frank his DPT shots, as such was his practice, but he has no recollection of any of the details concerning Frank. A doctor who assumed care for Frank in his second year is deceased and none of his medical records can be found.

Many months after the third shot, Frank regained the lost milestones and proceeded to develop in a normal physical manner, but his parents thought he was mentally impaired. During his youth, Frank was tested from time to time due to his slow learning, and those tests revealed that Frank had an IQ around 60 and was mentally retarded. The records of those tests make no reference to the events following the third DPT shot, nor do they indicate that the parents traced the cause of Frank's retardation to the third shot. Records of the doctor who treated Frank in the 1970's make no reference to Frank's previous medical history. At the age of 29, Frank suffered what appeared to be his first grand mal seizure and was treated by a neurologist, who described Frank as having had "a negative past medical history." Although that doctor noted Frank's retardation, there is no indication that the doctor was informed of any adverse reactions Frank suffered in the 72 hours following the third shot.

During the hearing before the special master, Frank's parents were asked why they never mentioned Frank's reaction to the third shot to any of Frank's subsequent health care providers. They answered that they understood the "par for the course, don't worry" statement from the doctor who gave the shot to mean that whatever Frank's later problems may have been, they did not

stem from the third shot. Frank's mother testified that only much later did she learn that Frank's retarded condition could be traced to the third DPT shot.

## III

The record made before the special master thus reveals the detailed current recollection of Frank's parents and cousin about the immediate effect of the third shot on Frank, an event which took place nearly 40 years ago. The record is also bereft of any indication in the records of Frank's subsequent testing and medical care which would confirm the family's current recollections of the events in the 72 hours following the third shot. On this record, the special master, referring especially to the testimony and demeanor of the fact witnesses, concluded that the failure of the parents ever to have reported the abrupt change in Frank's demeanor and development after the third shot to any subsequent health care provider prevented her from concluding that it is more probable than not that the abrupt changes occurred in the manner now recalled in such detail by the parents. The special master rejected the cousin's testimony out of hand as "simply not persuasive."

In a nutshell, the special master discounted the accuracy of the parents' current recollection of 40 year old events because of her belief that if those events had occurred, they would have been recounted somewhere in the subsequent health care history of Frank. Following dismissal of her petition, Mrs. Snyder petitioned the Court of Federal Claims for review.

## IV

The Court of Federal Claims is authorized to set aside any findings of fact by the special master found to be arbitrary or capricious. 42 U.S.C. § 300aa–12(e)(2)(B) (1994). In this case, the Court of Federal Claims reviewed the special master's finding of fact that the petitioner had failed to prove, by a preponderance of the evidence, that Frank suffered a Table Injury. Given the magnitude of the trauma associated with the third shot and the absence of any subsequent mention of that

trauma, the special master had questioned the memory of the parents and found their version of the facts not credible. Because such a "determination of credibility is uniquely within the purview of the special master," *Burns v. Secretary of the Dep't of Health & Human Servs.*, 3 F.3d 415, 417 (Fed.Cir.1993), the Court of Federal Claims sustained the decision of the special master as not arbitrary or capricious.

■ We are required to review *de novo* the Court of Federal Claims' determination as to whether the special master's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Patton v. Secretary of the Dep't of Health & Human Servs.*, 25 F.3d 1021, 1025 (Fed.Cir. 1994) (citing, *inter alia*, *Bradley v. Secretary of the Dep't of Health & Human Servs.*, 991 F.2d 1570, 1574 (Fed.Cir.1993) and *Hines v. Secretary of the Dep't of Health & Human Servs.*, 940 F.2d 1518, 1524 (Fed.Cir.1991)). We note, however, that we would reach the same result in this case even if we were free to apply a more deferential standard as suggested in *Perreira v. Secretary of the Department of Health & Human Services*, 33 F.3d 1375, 1376 (Fed.Cir.1994) (holding that this court may not disturb the judgment of the Court of Federal Claims unless the judgment is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law) (citing *Phillips v. Secretary of the Dep't of Health & Human Servs.*, 988 F.2d 111, 112 (Fed.Cir.1993) and *Munn v. Secretary of the Dep't of Health & Human Servs.*, 970 F.2d 863, 870 (Fed.Cir.1992)).

### V

■ In her brief to this court, Mrs. Snyder seeks to counter the special master's decision by referring again to her original belief, shared by her husband, that whatever the cause of Frank's delayed mental progress, it was not the DPT immunization. Her belief was anchored in her understanding of what the doctor told her just after the shot, namely that Frank's reaction was "par for the course" and nothing to worry about. She also refers to the likelihood that parents, in the past, would have accepted the word of a doctor without question or doubt. Thus, she argues that the absence of any later reference in Frank's records to the aftermath of the shot is explicable.

Although there may be some merit to Mrs. Snyder's view that in the distant past a parent might have ignored a child's adverse reaction to a DPT shot when consulting with medical officials later about a child's developmental problems, that explanation alone does not vitiate the special master's decision in this case. Here, the special master emphasized the specific detail of the parents' current memory, and implicitly formed a factual judgment that the recalled events were simply too dramatic to go unrecorded, notwithstanding the parents having been told that the events were "par for the course." Furthermore, the special master's opinion demonstrates her unease with the demeanor of the witnesses. While the nature of that unease is not explained in the special master's opinion, the record of the hearing discloses a possible reason for her concern. After the cousin was cross-examined, the special master asked her when she first discussed with the parents the fact that she noticed a change in Frank's behavior. The cousin replied: "Never did. I never did." "What about in preparation for this proceeding?" asked the special master. "Oh, you mean here, okay," answered the cousin. On redirect examination, the cousin was unable to recall whether she spoke with the parents before or after she discussed Frank's condition with the Snyder's counsel. The cousin's initial denial of ever having discussed Frank's condition with the parents, coupled with her inability to recall whether the discussion occurred before or after speaking to the Snyder's counsel about Frank's condition may explain why the special master rejected the cousin's testimony as "simply not persuasive," and emphasized the testimony and demeanor of the fact witnesses in refusing to credit the facts averred by them.

In the light of this record, we cannot say that the special master acted arbitrarily or capriciously in rejecting the facts alleged by Frank's parents and his cousin.

### VI

This case is being decided on the briefs, the parties having waived oral argument. As

noted above, the appellant's brief attempts to offset the lack of mention in the health care records of the post-shot effects on Frank, with the explanation that in years past, parents accepted a doctor's word without question. Thus, according to the parents, it is not surprising that they never mentioned Frank's reaction to his third shot to Frank's subsequent health care providers.

■ The government's responsive brief ignores that central point in appellant's brief, and leaves to the court the task of exploring the record in search of a sign of the special master's discomfort with the testimony and demeanor of the fact witnesses. Instead, the government's brief simply reminds us that credibility determinations are "virtually unreviewable," and proceeds to accuse the appellant of using "flimsy excuses" and "spurious[ ] charges" (p. 9), making "complaints more akin to meaningless quibbling than reasoned and compelling grounds" (p. 11), arguing "a ruse" (p. 14), offering a "feeble and shopworn excuse" (p. 14), and making an argument that is "either naive or absurd" (p. 16), in hopes of upsetting the special master's decision.

Such pejorative language has no place in any brief filed by the United States (or any other party) in this or any other court. For shame, that our government writes such a brief, instead of meeting the high standards of advocacy its citizens and courts deserve.

*AFFIRMED.*