# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 10-398V
Filed: June 30, 2013

*************************************

| | | |
|---|---|---|
| SHEA KYLIE SULLIVAN, | * | TO BE PUBLISHED |
| | * | |
| Petitioner, | * | Finding of Fact; Human Papillomavirus |
| | * | Vaccination (HPV); Joint Pain |
| v. | * | Inflammation; Rheumatoid |
| | * | Arthritis; Timing of Onset of Symptoms; |
| SECRETARY OF HEALTH | * | Contemporaneous Medical Records versus |
| AND HUMAN SERVICES, | * | Testimony |
| | * | |
| Respondent. | * | |
| | * | |

*************************************

*Sarah Reimers*, LeClairRyan, Washington, DC, for Petitioner;
*Alexis B. Babcock*, United States Dep't of Justice, Washington, DC, for Respondent.

## RULING REGARDING FINDING OF FACT[1]

**Zane,** Special Master.

      This matter is before the special master to resolve a factual dispute and make a finding of fact as to the timing of the onset of medical symptoms of joint and muscular aches and pains, that Petitioner, Ms. Shea Sullivan ("Petitioner"), allegedly experienced before, around or after she received the Human Papillomavirus ("HPV") vaccinations on June 27, 2007, August 29, 2007, and January 4, 2008. Petitioner filed her petition for compensation pursuant to the

---

[1] Because this ruling contains a reasoned explanation for the special master's action in this case, the special master intends to post it on the website of the United States Court of Federal Claims, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002). All decisions of the special masters will be made available to the public unless they contain trade secret or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would clearly be an unwarranted invasion of privacy. When such a decision or designated substantive order is filed, a party has 14 days to identify and to move to redact such information before the document's disclosure. Absent a timely motion, the decision shall be made available to the public in its entirety. Upon the filing of a timely motion to redact, along with a proposed redacted version of the decision, if the special master, upon review, agrees that the identified material fits within the categories listed above, the special master shall redact such material from the decision made available to the public. 42 U.S.C. § 300aa–12(d)(4); Vaccine Rule 18(b).

National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-1, *et seq.,*[2] claiming that the HPV vaccines she received in 2007-08 caused her to suffer joint and body pain and joint inflammation and eventually led to her being diagnosed with rheumatoid arthritis.[3]  Petition at 3-4; Transcript of January 24, 2012 Fact Hearing ("Tr.") at 176.

A fact issue arose regarding the timing of the onset of symptoms.  Despite that the medical records indicate it was more than three months after she received her third vaccine that Petitioner visited the doctor complaining of joint pain, Petitioner asserted her symptoms began earlier.  Petitioner claimed that she began to experience pain in her shoulder and swelling in her wrists and fingers in the latter half of 2007 after receiving her first and second vaccinations but before receiving her third vaccination.

The timing of the onset of symptoms is a material fact because the medical experts' conclusions regarding temporal relation could change if the onset of Petitioner's symptoms began earlier than stated in the medical records.  To resolve this issue, a fact hearing was conducted in January 2012, at which Petitioner and her parents, Dennis and Sandy Sullivan, testified.

As explained herein, based on the record as a whole, the special master finds that, as set forth in the medical records, Petitioner's symptoms of joint and muscle aches and pains following her receipt of the HPV vaccines began in late March or early April 2008 as stated in the medical records.  The medical records are clear, internally consistent, and complete.

In reaching her finding, the special master observed Petitioner and her parents as they testified.  Each had a detailed recollection of the onset of the knee pain in March-April 2008 that was consistent with the medical records.  But, other than the knee pain, the witnesses' testimony regarding the timing and onset of other post-vaccine joint pain was vague and confusing and, thus, cannot be accepted.  Furthermore, Petitioner's failure to visit a doctor despite experiencing such joint pain is inconsistent with her and her parents' vigilance in addressing Petitioner's health issues, especially when those issues might affect her athletic performance.  Finally, her activities, in particular, her affirmatively seeking and beginning work at a fast food restaurant, which required her to stand for long periods and the constant use her hands, is inconsistent with her suffering the type of pain which she described.

## I.  PROCEDURAL BACKGROUND

Petitioner filed her claim on June 28, 2010, three years after she received her first HPV vaccination.  P's Ex. 3 at 2.  In February 2011, Petitioner filed her expert report and a one-page

---

[2] Part 2 of the Vaccine Act established the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 through § 300aa-34 (2006) ("Vaccine Program").

[3] "Rheumatoid arthritis" is defined as a chronic systemic disease primarily of the joints, usually polyarticular, marked by inflammatory changes in the synovial membranes and articular structures and by muscle atrophy and rarefaction of the bones. In late stages deformity and ankylosis develop. The cause is unknown, but autoimmune mechanisms and virus infection have been postulated.  *Dorland's Medical Dictionary* 157 (32d ed. 2012).

supplemental expert report. P's Exs. 14 and 15. Petitioner's expert concluded that there was a strong possibility that her disease process resulted from her HPV vaccinations. P's Ex. 14. But, Petitioner's expert acknowledged that there was still a possibility that Petitioner's development of rheumatoid arthritis was due to a random event. P's Ex. 14. In a later-filed, supplemental report Petitioner's expert opined that he believed there was a probability that Petitioner's disease process resulted from her HPV vaccines. P's Ex. 18.

On May 16, 2011, Respondent filed her expert report. R's Ex. A. In that report, Respondent's expert opined, *inter alia,* that there was not a medically-appropriate temporal relation because three months had lapsed between the last vaccination and the onset of joint pain as reflected in the medical records. R's Ex. A at 6. Petitioner disputed this, filing her third affidavit, in which she asserted that her symptoms began with, *inter alia,* shoulder pain the latter part of 2007 after she received her first, then second vaccinations. P's Ex. 21. This prompted the fact hearing held on January 24, 2012.

Although originally the issue was identified as relating to the timing of onset of symptoms before, around and after the time of Petitioner's receipt of HPV vaccines, at the hearing, the focus was entirely on the timing of onset of symptoms after receipt of one or more of the vaccines. As such, the finding of fact here is limited to that issue.[4]

After the hearing, to ensure that all reasonable and necessary records were filed, Petitioner was ordered to file certain records based on the testimony at the hearing, *i.e.,* Petitioner's school records, Petitioner's running journals and excerpts from her social media pages. January 27, 2012 Order. Subsequently, some limited records were filed.

Having reviewed the records in April 2013, at a status conference, the special master noted that it appeared some school records were missing. The special master inquired as to whether there was any further documentary evidence would be submitted. Shortly thereafter, Petitioner's counsel indicated that no additional records were forthcoming.

Both parties have filed post-hearing briefs. This case is now ready for determination of a finding of fact as to the timing of onset of symptoms Petitioner experienced following her receipt of the HPV vaccinations.

---

[4] The records do indicate that Petitioner had lower back and possibly shoulder pain prior to receipt of the vaccine, from approximately March 2006 to April 2007, which does not appear to be disputed. P's Ex. 5 at 35, 36, 39, 42.

## II. RECORD

### A.  *The Documentary Record*

The documentary record consists of Petitioner's medical records and certain other records.

1. Medical Records

The medical records provide Petitioner's medical history.  Prior to receipt of the HPV vaccinations, Petitioner was generally healthy although she did consult regularly with her doctor regarding various medical problems.  P's Ex. 5 at 8-25.  Petitioner had annual bouts of upper respiratory infections, pharyngitis, and otitis media.[5]  *Id.*  In 2003, Petitioner was evaluated for a three- to four-week persistent headache.  P's Ex. 5 at 26-27.  Beginning in March 2006 through at least April 2007, two months before receiving her first HPV vaccine, Petitioner complained to her doctor about persistent, lower, left-sided back pain.  P's Ex. 5 at 35-36, 39, 42.

On June 27, 2007, Petitioner had her 16-year-old health maintenance visit with her primary care physician.  P's Ex. 5 at 53.  The doctor administered Petitioner's first HPV vaccine intramuscularly in her left arm.  *Id.*

Following this visit, Petitioner did not visit her doctor until April 2008, except to receive her second and third HPV vaccines on August 29, 2007 and January 4, 2008, respectively.  P's Ex. 3 at 3.  At these visits, Petitioner did not mention any aches or pains or reactions to the vaccines.  *Id.*

Petitioner's mother did phone the doctor three times during this period when Petitioner experienced other medical problems.  First, on August 10, 2007, Petitioner's mother called the primary care physician's clinic to report Petitioner was suffering from heart palpitations.  P's Ex. 5 at 54.  She did not mention joint or muscle aches or pains.  *Id.*  Second, in November 2007, Petitioner's mother again called regarding coughing Petitioner was experiencing.  P's Ex. 5 at 54.  Again, there was no mention of any joint or muscle aches or pains.  *Id.*  Third, on the day Petitioner received her third HPV vaccine, January 4, 2008, Petitioner's mother called the doctor to report that Petitioner had a headache, a sore throat, and abdominal pain.  P's Ex. 5 at 55.  There was no mention of any joint or muscle aches or pains.  *Id.*

Nearly a month after receiving her third HPV vaccination, in February 2008, the records reflect that Petitioner's mother again called Petitioner's primary care physician to report that Petitioner had a headache, sore throat, and abdominal pain.  P's Ex. 5 at 55.  Again, there was no mention of any muscle or joint aches or pains.  *Id.*

---

[5] Pharyngitis is defined as inflammation of the pharynx.  *Dorland's Illustrated Medical Dictionary* 1426 (32d ed. 2012).  Otitis media refers to the inflammation of the middle ear.  *Dorland's Illustrated Medical Dictionary*  1351 (32d ed. 2012).

On April 18, 2008, three months after receiving her third HPV vaccination, Petitioner returned to the doctor. P's Ex. 5 at 56. Petitioner complained of left knee pain, which she reported had been ongoing for one to two weeks. P's Ex. 5 at 56. Petitioner was referred to an orthopedic physician for an evaluation. *Id.*

Six months later, on October 21, 2008, Petitioner visited an orthopedist, Dr. Eric Lee. P's Ex. 7 at 1. Petitioner reported that the onset of her left knee pain was in April 2008 and that it had started while running on the beach. P's Ex. 7 at 7; P's Ex. 8 at 6.

Petitioner returned to her primary care physician in October 2008 as well. P's Ex. 5 at 56. Petitioner was to have an MRI of her knee the following date. *Id.* The notes indicate that Petitioner's parents had noticed swelling in Petitioner's hands, feet and one arm in the mornings. *Id.* The notes also refer to Petitioner's menstrual cycle problems while on birth control pills and note an inquiry regarding a possible relation between the pill and arthritis. *Id.* Laboratory results, for the most part, were normal, including a normal rheumatoid factor. P's Ex. 5 at 62.

Approximately two weeks later, on November 3, 2008, Petitioner sought a second opinion from another orthopedist, Dr. Scott Graham. P's Ex. 8 at 6-7. The medical history from that visit describes Petitioner's pain as beginning approximately seven months earlier, while running on the beach, which would date it back to approximately April 2008. P's Ex. 8 at 6-7; 11. The examination conducted at that time revealed that Petitioner had no other remarkable symptoms besides her chief complaint, the left knee pain. *Id.* The results of the physical examination at that time were similar to those of the previous exam by the other orthopedist, Dr. Lee. *Compare* P's Ex. 7 at 6-7 *with* P's Ex. 8 at 6. Petitioner saw Dr. Graham again on December 1, 2008. P's Ex. 8 at 11. Petitioner continued to complain of knee pain despite having received a cortisone injection. *Id.* Dr. Graham recommended and performed arthroscopic knee surgery on Petitioner's left knee on December 16, 2008. P's Ex. 8 at 12-13.

Petitioner had a post-surgery follow-up with Dr. Graham on February 11, 2009, at which Petitioner reported improvement of her knee pain. P's Ex. 8 at 25. Dr. Graham's notes indicate that Petitioner complained of pain in multiple joints *i.e.*, her hands, fingers and ankles. *Id.* Dr. Graham referred Petitioner to a rheumatologist. *Id.*

While not seeing a rheumatologist, on April 6, 2009, Petitioner did return to her primary care physician complaining of claw hands in the morning and pain in her joints—her hands, knees and shoulders. P's Ex. 5 at 63. Petitioner raised the issue of a possible causal association between her pain and her HPV vaccine. *Id.* The doctor's notes state that Petitioner explained she was raising this "because another friend had a similar complaint" and that one of her "parent[s] looked up on [the] internet 5 cases [and a] class action suit."[6] *Id.* The record contains an asterisked notation stating that during the orthopedic evaluation in October 2008, Petitioner had made "no comments re joint pain other than knee." *Id.*

Approximately three months later, on July 13, 2009, Petitioner saw a rheumatologist, Dr.

---

[6] During Petitioner's testimony at the January 24, 2012 hearing, she denied having any friends with issues and was unsure as to why that was noted in the medical record. Tr. at 93.

Thomas Powell. Dr. Powell's notes reflect that Petitioner gave a one-year history of an inflammatory polyarthritis. P's Ex. 12, Ex. 10 at13.[7] The lab values from Petitioner's tests were, nonetheless, apparently normal. P's Ex. 10. Dr. Powell's impression was that Petitioner likely had seronegative rheumatoid arthritis. P's Ex. 10 at 13, attached to P's Ex. 12. A note in her primary care physician's records dated July 13, 2009, indicated that Petitioner advised her doctor that she had been diagnosed with rheumatoid arthritis that day. P's Ex. 5 at 64.

A phone record dated August 3, 2009 stated that Petitioner's primary care physician, apparently in response to an inquiry, informed Petitioner's mother that "no scientific articles link[ed] Gardasil as [a] cause of arthritis." P's Ex. 5 at 65. Petitioner's mother apparently called her primary care physician again on October 23, 2009, as a phone record for that date contains the following entry: "joint pain – shoulder pain per mom Oct 08." *Id*.

Petitioner had a second rheumatologic consult with Dr. William C. Shiel, Jr. on September 9, 2009. P's Ex. 11 at 1. Petitioner reported persistent joint pains worsening at night, morning stiffness, difficulty getting out of bed, and an incomplete grip. *Id*. Dr. Shiel's notes reflect that the medical history given was that Petitioner's pains began with left shoulder pain two years earlier, which later involved the right shoulder, and then the wrists, knees, ankles, and fingers. P's Ex. 11 at 1. Dr. Shiel concluded that Petitioner's conditions were suggestive of rheumatoid arthritis, which, based on the medical history Petitioner provided, began two years earlier. *Id*. at 4.

2.   Other Documentary Materials

In addition to the medical records, Petitioner submitted certain other records. First, Petitioner submitted a pain journal into the record. P's Ex. 1, Attachment A. Petitioner began keeping this journal in late 2009, over a year and a half following receipt of her last HPV vaccination, the first entry dated November 7, 2009. P's Ex. 1 at 4.

Second, Petitioner submitted certain school records. The school records submitted consisted of her attendance records for three of her four high school years. P's Ex. 25. The year for which no record was submitted was 2007-08, her sophomore year, the period immediately following receipt of her first and second vaccines and the period when Petitioner received the third vaccine.[8]

---

[7] Although Dr. Powell's records were originally submitted as P's Ex. 10, his consultation report was not submitted with that exhibit. Rather, it was submitted subsequently as an attachment to her second affidavit, P's Ex. 12.

[8] In April 2013, the special master inquired regarding the absence of records relating to Petitioner's sophomore year, 2007-08, and was advised that Petitioner did not have those records because the school had switched reporting systems. However, the records for the 2006-2007 year, reflect a different reporting system than those for the school years 2008-09 and 2009-10. Thus, it appears the records for 2006-07 were generated under the former system. The records for the school years 2008-09 and 2009-10 reflect a different, presumably new system. Given that apparently the records from both the old and new reporting systems have been provided, it is uncertain as to why records from a single year, albeit the most relevant period for purposes of

6

Third, although Petitioner had indicated that her school trainer would testify and that there were records and notes which reflected her history of injuries, the only record submitted was a note from the high school trainer. P's Ex. 26. In that note, Petitioner's high school head athletic trainer, Mr. Ian Sabala, stated that the school had no record of Petitioner having a potential hand injury or hand swelling. P's Ex. 26.

Fourth, Petitioner filed excerpts of screen shots from her Facebook page. P's Ex. 27. Although Petitioner apparently had some activity during the June 2007-April 2008 period, those screenshots did not appear to include time line postings for that period. P's Ex. 27 at pdf #20.[9]

Petitioner had been asked to produce a running journal that she testified she had maintained during her sophomore year. Tr. at 83. Petitioner testified that, most likely, she had discarded this journal. *Id.* Indeed, it was confirmed later after the April 2013 status conference that she no longer had that journal.

### B. Testimony

At the fact hearing held on January 24, 2012, Petitioner, her mother, Sandy Sullivan, and her father, Dennis Sullivan, testified. Prior to the hearing, an affidavit was submitted for each of Petitioner's parents. Petitioner submitted three separate affidavits. A summary of the testimony is as follows.

1.      Petitioner, Shea Sullivan

Petitioner provided testimony through three affidavits as well as in person at the hearing. *See generally* P's Exs. 1, 12 and 21 and January 24, 2012 Transcript ("Tr.") In her first affidavit, dated June 22, 2010, Petitioner stated that prior to receiving the HPV vaccines she was a "healthy and active teenager." P's Ex. 1 at 1. She described herself as an athlete "[who] played competitive volleyball, softball, hockey . . . and basketball." *Id.* Petitioner stated that she "was captain of [her high school's] cross country team, and an active participant of the track and field team . . . ." *Id.* In this affidavit, Petitioner stated that as of June 27, 2007, she had been diagnosed with rheumatoid arthritis.[10] *Id.* She stated that around September 2008, she was forced to stop participating in all physical activity due to severe chronic body and joint pains. *Id.*

Petitioner's second affidavit, dated November 11, 2010, was submitted in response to Respondent's Rule 4 Report. P's Ex. 12. In that affidavit, Petitioner identified the time frame when she saw Dr. Graham, the orthopedist who performed her knee surgery in December 2008, for a post-surgical appointment as being in February 2009. P's Ex. 12, ¶ 1. Petitioner attached Dr. Powell's consultation report, which had not been provided with his records, and stated that

---

this case, would be unavailable regardless of which system was in effect during that year.

[9] The facebook excerpts indicate Petitioner had posted "likes" for the 2008 period.

[10] As explained *infra,* Petitioner subsequently acknowledged in her second affidavit that she had not been diagnosed until July 2009. P's Ex. 12, ¶ 2.

she had been diagnosed with inflammatory arthritis in July 2009. P's Ex. 12, ¶ 2.

Petitioner's third affidavit, dated July 28, 2011, was filed after Respondent's expert's report. P's Ex. 21. In that affidavit, Petitioner stated that she had experienced pain in her left shoulder shortly after June 2007. P's Ex. 21, ¶ 2. She also averred that the index finger on her right hand swelled in late 2007 and the beginning of 2008. P's Ex. 21, ¶ 3. Petitioner stated that she began to experience knee pain and her knee became swollen during her sophomore year and that she went to the doctor in April 2008 regarding her knee. P's Ex. 21, ¶ 4. Finally, Petitioner also stated that she believed, at least at that time, that these pains were sports related injuries. P's Ex. 21, ¶ 6.

Finally, Petitioner testified at the January 2012 hearing. She described her dedication to sports, in particular to running. Tr. at 14. She testified that she was on the varsity cross country team but not on the varsity track team. Tr. at 138.

Petitioner testified about receiving her HPV vaccinations. Tr. at 14, 26, 79. She explained that she experienced pain in her left shoulder in the summer of 2007 after she received her first vaccine and after she had been involved in volleyball camp. Tr. at 17, 19-20. She concluded that the pain was sports-related. Tr. at 19-20, 79. She said that this pain became chronic and that it apparently affected her running stride. Tr. at 20-21. Petitioner stated that the pain did not spread during that season, it did not cause her to stop running and she did not report it to anyone. Tr. at 20-21, 79.

Petitioner testified in detail regarding her run on the beach in March-April 2008 with her uncle and how she had been injured during that run. Tr. at 35. Petitioner explained how she had to withdraw from competing in a race shortly thereafter due to her injury. Tr. at 36-38. It was at this point that Petitioner saw the doctor regarding her knee pain. Tr. at 36-38. Petitioner explained that after she injured her knee her running performance declined. Tr. at 34-38.

Petitioner's chronology of doctor's visits beginning with her visit in April 2008 regarding her knee through her visits to rheumatologists in 2009 was, for the most part, consistent with the medical records. She described going to her primary care physician regarding her knee pain. Although she was referred to an orthopedist, Petitioner decided to take care of her symptoms herself at that time. Tr. at 39. It was only after several months that she returned to her doctor, in October 2008, and went to an orthopedist. Tr. at 42-43. Petitioner explained that the orthopedist, Dr. Graham, performed arthroscopic knee surgery on Petitioner's left knee in December 2008. Tr. at 46-48. It was in her follow-up appointment with Dr. Graham that the swelling of her joints was clearly evident. Tr. at 88-89. It was at that time that she mentioned the pain in her other joints. Tr. at 48. It was another several months before Petitioner visited a rheumatologist in July 2009. Tr. at 53-56. It was at that time that she was diagnosed with rheumatoid arthritis. Tr. at 53-56.

Petitioner also discussed how the pain progressed. She testified in detail regarding her joint pains for the period around her eighteenth birthday, in 2010. Tr. at 62. She especially described how in her senior year of high school, she needed help getting ready for school and had trouble walking. Tr. at 176.

8

### 2. Petitioner's Mother, Sandy Sullivan

Mrs. Sandy Sullivan, Petitioner's mother, also provided an affidavit and testified at the hearing. P's Ex. 23, Tr. at 179. In her affidavit, Mrs. Sullivan said that she recalled Petitioner getting her first HPV vaccine in June 2007. P's Ex. 23, ¶ 3. Shortly thereafter, Petitioner began to experience shoulder pain while she was at volleyball camp. P's Ex. 23, ¶ 5. Mrs. Sullivan recalled Petitioner's pain occurring during a trip to the desert in the winter of 2008. P's Ex. 23, ¶ 8. Without specificity as to dates, Mrs. Sullivan also remembered the pains becoming so severe that Petitioner was eventually taken to a rheumatologist and diagnosed with rheumatoid arthritis. P's Ex. 23, ¶¶ 9-11.

In her testimony, Mrs. Sullivan acknowledged that at a younger age, Petitioner seemed to have more illnesses than her other children. Tr. at 180-81. Mrs. Sullivan accompanied Petitioner to her doctor's appointment on June 27, 2007, when she received her first HPV vaccination. Tr. at 185. Immediately after the vaccination, she noted that her daughter's arm was sore and red but this did not alarm her because the doctor had warned her about that. Tr. at 187. Mrs. Sullivan also testified that she did recall Petitioner having achy pains following volleyball camp, especially in her shoulder, but she was not concerned because it seemed like normal pain related to playing sports or due to her new mattress. Tr. at 188-89. Mrs. Sullivan did not recall any pain in 2007 that was preventing Petitioner from performing normal activities, and Petitioner did not ask her to contact the doctor regarding any such pains. Tr. at 189.

As with Petitioner, Mrs. Sullivan vividly remembered the first, real pain experienced by Petitioner as being near the beginning of 2008, which she attributed to running on the beach with Mrs. Sullivan's brother. Tr. at 193. It was at that point that Mrs. Sullivan concluded Petitioner had suffered a serious injury. Tr. at 221. Her husband took Petitioner to the doctor shortly thereafter in April 2008. Tr. at 194. Although Mrs. Sullivan acknowledged that Petitioner at some point complained about pain in her wrists, fingers and knees, she could not identify the time frame in which this began. Tr. at 190. When Mrs. Sullivan brought Petitioner to her primary care physician in October 2008, Mrs. Sullivan testified that she recalled advising the doctor of Petitioner's swollen fingers at that time. Tr. at 202-03. Mrs. Sullivan did believe that in the fall of 2008, prior to Petitioner's surgery in December, Petitioner was still running, but was somewhat uncertain about this, admitting that she was unaware of the particular seasons for specific sports. Tr. at 198. Mrs. Sullivan did attend her daughter's subsequent visits to Dr. Lee and Dr. Graham, the two orthopedists whose opinions they sought regarding her left knee pain in October and November of 2008. Tr. at 194-95. Mrs. Sullivan did remember that at those visits Petitioner told both doctors that she had other joint pains. Tr. at 195, 197.

### 3. Petitioner's Father, Dennis Sullivan

Mr. Dennis Sullivan, Petitioner's father, also provided an affidavit in January 2012 and testified at the hearing. Tr. at 238. In his affidavit Mr. Sullivan recalled that his daughter began to "regularly complain of severe shoulder pain" in the summer of 2007 while she was involved in a volleyball summer camp. P's Ex. 24, ¶ 4. Mr. Sullivan explained how the shoulder pain was attributed to sports injuries and growing pains. P's Ex. 24, ¶ 7. During her fall cross country

9

season, Mr. Sullivan worked with Petitioner to correct her form as she held her arms in an awkward position, but he was ultimately unsuccessful. P's Ex. 24, ¶ 5. Mr. Sullivan also stated that Petitioner's significant pain began in the spring of 2008, with her knee pain. P's Ex. 24, ¶ 8. Mr. Sullivan concluded the affidavit stating that over the months that followed Petitioner's pain worsened and after numerous visits to doctors it was revealed that Petitioner had rheumatoid arthritis. P's Ex. 24, ¶ 9.

At the hearing, Mr. Sullivan testified that Petitioner reported soreness in her shoulder and that "she was having trouble raising it" during her volleyball practices. Tr. at 244. He also stated that this pain continued during her cross country season in the fall of 2007, when he saw her "holding her arms up in an awkward position." Tr. at 248. Later in his testimony, he said he was unsure whether the pain was causing her to hold her arms up or it was just an awkward running style. Tr. at 271. At one point, he testified that he related Petitioner's holding her hands in an awkward position while running as being due to her obvious knee pain. Tr. at 253.

Mr. Sullivan further testified that Petitioner began complaining about knee pain after running with her uncle on the beach. Tr. at 252. Petitioner told Mr. Sullivan that she felt that the distance they had run and the fact that it was on the sand had contributed to the knee problem. Tr. at 252. He also testified to attending a track meet subsequent to the beach run where Petitioner had to withdraw from her second race due to her knee pain. Tr. at 253. It was following this track meet that he took her to her pediatrician, who gave them a referral to an orthopedist. Tr. at 254. They did not immediately see the orthopedist as her knee pain began to subside. *Id*. Mr. Sullivan also testified that he recalled Petitioner's difficulties performing daily activities such as getting ready for school. He was uncertain as to when these began, at one point saying he thought it could have been the end of 2007 but then also saying he thought it was around the time of his brother-in-law's death in March 2008. Tr. at 275.

## III. APPLICABLE LEGAL STANDARDS

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. 42 U.S.C. § 300aa-13(a)(1)(A). The special master must "believe that the existence of a fact is more probable than its nonexistence before [she] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence. *In re Winship*, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring, *quoting* F. James, *Civil Procedure* at 250-51 (1965)). Mere conjecture or speculation is insufficient to satisfy the preponderance standard. *Snowbank Enterprises v. United States,* 6 Cl.Ct. 476, 486 (1984).

In determining whether a petitioner is entitled to compensation under the Vaccine Act, a special master must consider the record as a whole. 42 U.S.C. § 300aa-13(a)(1). The special master may not make a finding based on the claims of a petitioner that are not substantiated by medical records or medical opinion. *Id.* The process for finding facts pursuant to the Vaccine Act begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). As set forth in 42 U.S.C. § 300aa-13(b)(1)(A), a special master shall consider "all . . . relevant medical or scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report . . . regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or

death . . . ."

In resolving factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993)(A special master must decide whether to accord greater evidentiary weight to contemporaneous medical records or other evidence, *e.g*., later-given oral testimony, and such a decision must evince a rational determination). "Medical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Indeed, records created contemporaneously with the events that they describe are presumed to be accurate as it is recognized that individuals seeking treatment will report the circumstances relating to their symptoms and history accurately to ensure the doctors have all information necessary to treat their ailments. *Cucuras,* 993 F.2d at 1527-28. Similarly, the doctors recording the histories are paying particular attention to record such histories accurately so that they will be aware of all the patient's ailments and consider them in determining treatment. *Id.* As such, particular attention should be paid to contemporaneous medical records and opinions of treating physicians. *Capizzano v. Sec'y of Health & Human Servs.,* 440 F.3d 1317, 1326 (Fed. Cir. 2006); *see also Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585, 2006 WL 3734216 at *7 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). With regard to medical histories it has been recognized that "careful attention is paid to those contemporaneous histories, which are given prior to any thought of litigation. . . ." *Coffelt v. Sec'y of Health & Human Servs.,* No. 90-591, 1992 WL 158714 at *6 (Fed. Cl. Spec. Mstr. Feb. 24, 1992).

When considering the weight to be accorded oral testimony versus contemporaneous records, "[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight." *Murphy v. Sec'y of Health & Human Servs.,* 23 Cl.Ct. 726, 733 (1991), *aff'd,* 968 F.2d 1226 (Fed. Cir.), *cert. denied sub nom. Murphy v. Sullivan,* 506 US 974 (1992)](citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 396 (1947)) ("Where such testimony is in conflict with contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact."); *Montgomery Coca–Cola Bottling Co. v. United States,* 615 F.2d 1318, 1327 (Ct.Cl. 1980) ("The subjective intent testimony of the plaintiff can only be seriously considered to the extent it is consistent with the objective evidence.... We also believe that [the testimony of a particular fact witness] is 'infected with self-interest' " and that while his testimony, of course, is admissible it cannot be given the weight accorded it by the trial judge; nor can [that fact witness'] testimony prevail over the inferences unavoidably drawn from the objective documentary evidence...."); 32A *C.J.S. Evidence* § 1033 (1964)). Records that are clear, consistent and complete should be accorded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.,* No. 03-1585, 2005 WL 6117475 at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). In considering testimony, the special master must assess the demeanor of the witnesses when testifying. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009). Moreover, to overcome the presumptive accuracy of the written medical records through testimony, the testimony must be "consistent, clear, cogent, and compelling." *Sanchez v Sec'y of Health & Human Servs.,* No 11-685, 2013 WL 1880825 at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90-2808, 1998 WL 408611 at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

11

## IV. DISCUSSION

Petitioner seeks to supplement and, in some cases, supplant the medical records with her and her parents' affidavits and testimony offered four years after the pertinent events claiming that her joint pains began much earlier than reflected in the records, during the summer and fall of 2007. As explained below, the medical records are clear and consistent. In fact, the testimony relating to the onset of the knee pain is also consistent with the medical records in establishing the onset of such pain as occurring in March-April 2008.

On the other hand, the testimony regarding the alleged onset of pain earlier than March-April 2008, unsubstantiated by the medical records, was vague, confusing and inconsistent. Moreover, the testimony that Petitioner simply ignored these medical symptoms is inconsistent with Petitioner's and her parents' practice of vigilantly reporting injuries to the doctor promptly. Petitioner's testimony of experiencing debilitating joint pain is also inconsistent with her actions of getting a job which would require constant use of her hands during this very period. The medical records, made contemporaneously when medical treatment was sought, are reliable and accorded great weight. Petitioner's testimony that she experienced earlier aches and pains is not substantiated by the records. As such, the special master finds that this testimony cannot be used to supplant the medical records and alter the date of onset of joint pain of March-April 2008 reflected in the records. Upon consideration of the record as a whole, the special master finds that based on the medical records, the onset of Petitioner's joint pains and aches following receipt of the HPV vaccinations began in March or April 2008, when Petitioner first reported her knee pain. Ex. 5 at 56; Tr. at 275.

### A. *The Medical Records Are Clear and Consistent That the Onset of Symptoms Occurred in March-April 2008.*

The special master finds that the medical records are clear and internally consistent. Those records indicate that the first instance she complained of joint and muscle aches and pains following the HPV vaccines occurred in late March or early April 2008, when Petitioner complained of knee pain. P's Ex. 5 at 56. At that time, she told the doctor that this knee pain had been ongoing for the last one to two weeks. P's Ex. 5 at 56.

The medical records do not reflect any mention of other joint pains until months after her April 2008 visit regarding her knee pain. It was in October 2008 that her parents, not she, mentioned to the doctor that they had observed some swelling in Petitioner's hands in the mornings. P's Ex. 5 at 56. The records further indicate that it was not until 2009 following her knee surgery, that Petitioner herself complained of joint pain in her hands, fingers, or ankles when she visited an orthopedist following her knee surgery. P's Ex. 8 at 25. At this time, Petitioner referred to this as different pain than she had previously experienced with her knee. P's Ex. 5 at 63.

The medical histories provided during Petitioner's medical consultations consistently reflect that her pain began in March-April 2008. At her doctor's visit in April 2008, she identified the onset as having been one to two weeks before. P's Ex. 5 at 56. At her next

12

doctor's visit in October 2008, when she had a consultation with Dr. Lee, the orthopedist, she reported that her pain had begun in April 2008. P's Ex. 7 at 7.

At her next doctor's visit in November 2008, to Dr. Graham, the second orthopedist she visited, the history again noted that Petitioner's symptoms began when she was running on the beach approximately six or seven months earlier, dating to approximately April 2008. P's Ex. 8 at 6-7; 11. Dr. Graham noted that she had no other remarkable symptoms besides her chief complaint of left knee pain. P's Ex. 8 at 7.

When she next saw her primary care physician in April 2009, for the first time, Petitioner's chief complaint was reported as having painful claw hands in the morning. P's Ex. 5 at 63. In the records, Petitioner explained that her knee pain had resolved with the surgery but that she now had different pain in her knees as well as her shoulders and hands. *Id.* Significantly, at this visit, Petitioner identified the onset of this pain as beginning approximately twelve months earlier, which would place it in April 2008, the same time as her knee pain. *Id.*

In July 2009, when Petitioner went to the first rheumatologist, Dr. Powell, the medical history also reflects that she told him her pain began approximately one year earlier. P's Ex. 12, Ex. 10-13 attachment thereto. When Petitioner subsequently went back to her primary care physician to report Dr. Powell's diagnosis, the notes reflect that Petitioner's mother noted that the first indication of pain was shoulder pain in October 2008. P's Ex. 5 at 65.

Admittedly, there is one notation in the medical records from the last doctor which whom Petitioner consulted in September 2009, Dr. Shiel, a rheumatologist. P's Ex. 11. Those records indicate that Petitioner gave a history of having joint pain for two years beginning with her left shoulder, which would place the onset at September 2007, much earlier than any of the other medical records. *See* P's Ex. 11. There are several reasons why this notation is not considered reliable.

First, because the lapse between the onset of any pains was so far removed from this visit, it is understandable that dates given in the medical history would not be as accurate. Indeed, due to this lapse, Petitioner's memory may not be as accurate in providing a history. Petitioner herself acknowledged this as a possibility. When discussing her symptoms at the hearing, Petitioner admitted to having some difficulty remembering specific times and dates. Tr. at 60-61 (confusion about dates when speaking to Dr. Shiel).

Second, alternatively, this notation is likely a gross approximation by Dr. Shiel as to the time frame. Given Dr. Shiel was not consulted until the fall of 2009, pain that began in March or April 2008 would be close to two years old so an approximation of two years could be understandable. In that Dr. Shiel's notation and the timing of onset was not critical to his diagnosis, such an approximation would be appropriate for him to make.

Third and finally, another factor in considering the date in the record was that Petitioner had already begun to contemplate litigation. The medical records indicated that only shortly before this visit, Petitioner told her physician that she associated her condition with the HPV vaccines she received. P's Ex. 5 at 63. She advised that a friend of hers had complained of

similar symptoms and an alleged causal relation with the HPV vaccines. *Id.* In April 2009, Petitioner reported to her primary care physician that her parents had looked up cases and found indications of a class action suit regarding HPV. P's Ex. 5 at 63. In August 2009, after consulting Dr. Powell, Petitioner advised her primary care physician that she wanted all her lab results because of the scientific articles that she had read linking HPV to rheumatoid arthritis. P's Ex. 5 at 65. Petitioner had already begun to contemplate litigation by the time of this second consultation with Dr. Shiel. As such, her statements regarding her medical history to Dr. Shiel with whom she consulted subsequently must be viewed with this in mind as well. As such, they carry less weight than the others. *See generally Coffelt*, 1992 WL 158714 at *6 (statements given prior to any thought of litigation are reliable).

In light of these factors, the testimony and the other medical records, this notation of a two-year onset appears to be an anomaly and not reliable. The other medical records consistently date the pain back to March-April 2008. This includes the medical histories Petitioner herself provided to various doctors until that point. These histories are provided to ensure the proper diagnosis and treatment. Given this, the special master is persuaded that these consistent records and statements made in these records for the purpose of accurate diagnosis and treatment reflect the accurate date as to onset. *Curcuras,* 993 F.2d at 1527-28. These medical records consistently refer to the onset of pain following the vaccines as starting in March-April 2008.

## B. *The Testimony Is Consistent with the Medical Records Regarding the Onset of Joint Pain Occurring with Her Knee Pain in March-April 2008.*

In considering and evaluating the testimony of Petitioner and her parents, it was evident that Petitioner and her parents each recalled vividly the incident in March-April 2008 when Petitioner ran on the beach with her uncle and that this was when Petitioner's joint pain began. Petitioner described how she had gone on a run with her uncle at the beach and that the run was more difficult than usual. Tr. at 35. Despite her belief that she was in very good shape, running ten miles without problems, her knee pain during that run became so severe that at one point she had to stop. *Id.*

Mr. and Mrs. Sullivan's testimony regarding the onset of the knee pain was consistent with Petitioner's testimony. Mrs. Sullivan recalled petitioner running on the beach with her brother after which she concluded Petitioner suffered a serious injury that required her to go to the doctor. Tr. at 193-94, 221. Mr. Sullivan also remembered Petitioner began complaining about knee pain after running on the beach with her uncle. Tr. at 252. It was after the subsequent track meet when Petitioner had to withdraw from her second race, that he took her to the doctor. Tr. at 253-54. Mr. Sullivan also testified that Petitioner's awkward hand positions while running was due to her obvious knee pain. Tr. at 253.

The special master had an opportunity to observe the witnesses' demeanors when describing certain events regarding the onset of pain and, in particular, how accurate, vivid and detailed they recalled the particular knee pain onset events. *See Sanchez v. Sec'y of Health & Human Servs.,* No. 11-685, 2013 WL 1880825 at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013 (citing *Andreu v. Sec'y of Health & Human Servs.,* 569 F.3d 1367, 1379 (Fed. Cir. 2009)(an assessment

14

of a fact witness's credibility may involve consideration of the person's demeanor while testifying). Petitioner and her parents' testimony is clear and consistent regarding the onset of pain as occurring when Petitioner ran on the beach in March-April 2008. Based on her observations of the testimony, the special master accords the testimony regarding this onset of knee pain, also consistent with the medical records, great weight.

**C.** ***The Testimony Regarding the Onset of Pain Earlier Than March-April 2008 Is Unclear, Confusing and Inconsistent and Does Not Establish That It Is More Probable That The Symptoms Began Earlier Than What Is Set Forth in the Medical Records.***

In contrast to the clear testimony regarding the onset of knee pain in March or April 2008, the testimony regarding the onset of aches and pains claimed to have occurred earlier is not reliable. Citing *Lowrie v. Sec'y of Health & Human Servs.,* No. 03-1585, 2005 WL 6117475 (Fed. Cl. Spec. Mstr. Dec. 12, 2005), Petitioner argues that there are events not contained in the medical records because she did not see the doctor despite having symptoms. Petitioner asserts that this testimony should be used to establish the dates her symptoms began at an earlier time despite no substantiation in the contemporaneous medical records and despite the events occurred approximately four years earlier.

Having considered the witnesses and their testimony, and as explained below, the special master finds that the testimony does not establish that it is more probable than not that the onset of certain symptoms occurred earlier than March-April 2008. First, the testimony is unclear and vague as to the timing of the onset of conditions and, thus, not reliable when compared with the clear, consistent contemporaneous medical records. *Thomas v. Sec'y of Health & Human Servs.,* No. 01-645, 2007 WL 470410 at *2 (Fed. Cl. Spec. Mstr, Jan. 23, 2007) (citing *Blustein,* 1998 WL 40866 at *5). Second, having considered the witnesses' demeanors, their testimony that they ignored what they themselves describe as significant medical symptoms is inconsistent with their demeanor of vigilantly monitoring Petitioner's medical condition and reporting any medical symptoms to doctors promptly. *Sanchez v. Sec'y of Health & Human Servs.,* 2013 WL 1880825 at *6. Third, Petitioner's activities in 2008, in particular her starting a job during that period, is inconsistent with her experiencing the severe medical symptoms described in the testimony.

1. The Testimony Regarding the Onset of Symptoms as Being Earlier Than March-April 2008 Was Vague, Confusing and Inconsistent.

The testimony regarding Petitioner's alleged medical symptoms that were to have begun earlier than reflected in the medical records was vague, confusing and inconsistent. For instance, Petitioner's testimony regarding the details of how and when the pain affected her running during 2007-08 was confusing. At one point, Petitioner testified that in June 2008 she iced her shoulder every day after practice. Tr. at 40. But, when asked to specify how often she experienced pain in her shoulder that required her to ice it, she could not recall. Tr. at 141-42. She later stated she would only ice it if it was sore. Tr. at 141-42.

The testimony regarding the timing of the severity of the shoulder pain was also confusing and inconsistent. Petitioner testified that about two weeks after she got her first vaccine she developed shoulder pain. Tr. at 17. At first, she testified that when she first began

15

to experience the pain in her sophomore year, 2007-08, it would only be in the morning and that it would have dissipated by the afternoon and because she ran in the afternoon, it would not necessarily affect her running at all. Tr. at 18, 88-89. But then at another point in her testimony, in stark contrast, Petitioner testified that the pain was such that it caused her to alter her running stride and, in particular, the positions of her arms. Tr. at 140.

And, much of the testimony regarding Petitioner's aches and their effects relating to her running track was also confusing and inconsistent. Mr. Sullivan recalled that after Petitioner withdrew from the meet in the spring of 2008, she never ran again despite attempts to do so. Tr. at 291. On the other hand, Petitioner said that she started to run again in June 2008 although not to her potential. Tr. at 40. The school records indicate that Petitioner was still signed up and received credit in her junior year, 2008-09, for a period for cross country in the fall and track in the spring. P's Ex. 25. Petitioner's original affidavit stated she had been the captain of the cross country team. P's Ex. 1. But, in her testimony, she said she quit cross country in August 2008, prior to her junior year and prior to being the captain of the team. Tr. at 38-40. On the other hand, Petitioner's mother seemed to believe that Petitioner was still running up to the time of her surgery, which would have been in December 2008. *Compare, e.g.,* P's Ex. 24, ¶ 8 *with* Tr. at 248. And, the medical records from her visits to the two orthopedists, Dr. Lee and Dr. Graham, both indicate that she was running cross country and track. P's Exs. 8 and 9.

Mrs. Sullivan's testimony regarding the onset and progression of Petitioner's pains was unclear. At one point, Mrs. Sullivan testified that she thought Petitioner's pains started near the end of 2007. Tr. at 212. But, upon further inquiry, Mrs. Sullivan said that she knew the problems with Petitioner's hands which interfered with her daily activities occurred in her junior and senior years, 2008-09 and 2009-10. Tr. at 217-18. But, at another point in her testimony when asked when she actually had begun to assist Petitioner with daily activities, Mrs. Sullivan said she was very bad with dates and could not identify a particular time frame. Tr. at 212, 228, 231. Mr. Sullivan also said he believed that Petitioner had problems with her wrists at some time around the end of the year in 2007. Tr. at 247-49; 305. At another point, he said he thought it was around the same time as when the knee pain started, in March 2008, with the funeral of his brother-in-law. Tr. at 305. But, he, too, admitted that he could not pinpoint a specific event during that time. Tr. at 247-249.

Petitioner's and her parents' testimony regarding the onset and progression of symptoms being earlier than reflected in the medical records was vague, confusing and inconsistent. Where the details of testimony are not consistent, such testimony cannot be credited especially when it is not substantiated by medical records. *Murphy,* 23 Cl.Ct at 733; *Blustein v. Sec'y of Health & Human Servs.,* 1998 WL 408611 at *5 (Fed. Cl. Spec. Mstr. June 30, 1998) (to overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent and compelling"). The testimony at the hearing, which is unclear and vague, is not consistent with the history of onset as recorded in the medical records. As such, it does not overcome the presumption that the written medical records are accurate. *Parcells v. Sec'y of Health & Human Servs.,* No. 03-1192, 2006 WL 2252749 at *10 (Fed. Cl. Spec. Mstr. July 18, 2006)(citing *Blustein,* 1998 WL 408611 at *5).

Finally, comparing the testimony regarding the onset of symptoms alleged to have

16

occurred earlier than reflected in the records with the witnesses' recollections regarding the onset in March-April 2008 and the nature of pain experienced far later leads the special master to find that the testimony regarding early onset is not reliable and cannot be accorded much weight. As already referenced *supra*, Discussion I.B., the witnesses testified with certainty regarding the onset of Petitioner's knee pain in March-April 2008. Tr. at 35 (Petitioner); Tr. at 193 (Mrs. Sullivan); Tr. at 252 (Mr. Sullivan). They also testified vividly that during her junior and senior years in high school, in 2008-09 and 2009-10, Petitioner had experienced consistent, multiple pains. Tr. at 69 (Petitioner—in senior year every day woke up sick and struggling); Tr. at 152 (Mrs. Sullivan—recalls in the summer of 2009 had much pain in ankles, knees, wrists and fingers); Tr. at 269 (Mr. Sullivan—as a senior trying to manage pain). These are the very events that are clear in the medical records. This testimony was consistent with the medical records.

In contrast, in their testimony regarding the onset of symptoms that were alleged to have occurred earlier than reflected in the medical records, *i.e.,* the alleged onset of pain in the fall or winter of 2007, they were uncertain and vague. The special master cannot rely on these vague statements made with uncertainty and make findings based on them in the absence of records to substantiate these statements.

2. The Testimony, Which Suggests Petitioner and Her Parents Did Not Promptly Seek Medical Attention, Is Inconsistent With Their Practice of Vigilantly Reporting Ailments.

Second, the Petitioner's and her parents' testimony that during late 2007 and early 2008 they ignored Petitioner's joint pains is inconsistent with their practice of promptly seeking medical treatment for Petitioner's ailments. The records indicate that Petitioner's mother was diligent about contacting doctors regarding Petitioner's ailments. As the records indicate, Petitioner's mother called Petitioner's primary care physician three times during the period she was receiving vaccines, in August of 2007, November 2007 and January 2008 to report various ailments from which Petitioner was suffering. P's Ex. 5 at 54-55. Mrs. Sullivan reported at various times, coughing and heart palpitations, a stomach ache and sore throat. *Id.* But, on none of these occasions did Mrs. Sullivan mention any joint aches or pains despite that Petitioner was to have been suffering from them. But, at the same time, the records reflect that Petitioner and her parents were diligent in contacting the doctor regarding other ailments. It "strains reason" that Petitioner and her parents would not also report the joint aches and pains she now claims were occurring during the same times she was reporting other symptoms. *Cucuras v. Sec'y of Health & Human Servs.,* 26 Cl.Ct. 537, 543 (1992), *aff'd.,* 993 F.2d 1525 (Fed. Cir. 1993).

Additionally, that Petitioner and her parents would not report these aches and pains when they were occurring is also unreasonable given their past practices of promptly reporting similar joint aches and pains. Petitioner repeatedly visited the doctor between March 2006 and April 2007 for Petitioner's chronic, left-sided back pain. P's Ex. 5 at 35, 39, 42. In August 2005, Petitioner visited the doctor because she was reporting that her hands and soles of her feet were sweating excessively. P's Ex. 5 at 34. Petitioner was astute about reporting these pains. If she had been experiencing such problems, Petitioner would have reported them and sought medical advice.

Petitioner's explanation for not reporting these symptoms was that she did not believe it

17

was important to do so. But, she also testified how they had affected her running position and her running performance. When discussing running, Petitioner explained how dedicated to running she was during that period. Tr. at 83. She described herself as completely involved in running. *Id.* Given Petitioner's passion for running, it is impossible to accept that she would have allowed such pain to continue without consulting a doctor. Had Petitioner been experiencing such physical problems that were stifling her running performance, she would report them promptly to her doctor as she reported her other problems.[11] Tr. at 113.

Petitioner's alleged failure to consult her trainer or doctor promptly to have her medical problems addressed so she could return to her peak running condition is simply inconsistent with the care to which she paid to her physical condition. Had Petitioner experienced an ailment as she described, she would have sought medical assistance so that she could maintain top running performance.

Certainly, the special master believes that Petitioner and her parents sincerely and earnestly testified regarding these matters. But, given their practice of reporting health issues to doctors, that they did not report any symptoms to the doctor during this period indicates that those aches and pains did not begin as early as the Petitioner now asserts. Based on this, the special master finds it is more likely than not that these pains were not occurring during the latter part of 2007 and early 2008 period, before March-April 2008. *Doe/17 v. Sec'y of Health & Human Servs.,* 84 Fed. Cl. 691, 711 (2008); *Ryman v. Sec'y of Health & Human Servs.,* 65 Fed. Cl. 35, 41-42 (2005); *Snyder v. Sec'y of Health & Human Servs.,* 36 Fed. Cl. 461, 465 (1996) (stating that if Petitioner had suffered symptoms immediately following vaccination, it was more likely than not that even his parents' mention of it would be noted by at least one of medical professionals and that the absence calls into question petitioner's memory of events, not sincerity), *aff'd.,* 117 F.3d 545, 547-48 (Fed. Cir. 1997).

3. <u>Petitioner's Activities Following Receipt of the Vaccines Are Inconsistent with Her Experiencing the Pain About Which She Testified as Occurring During the Same Period</u>.

Third, Petitioner's activities during 2008 were inconsistent with the debilitating pain in her joints, especially her hands and shoulders, that Petitioner testified she experienced beginning in late 2007. In her first affidavit Petitioner said she "was forced to stop participating in any and all physical activity due to severe chronic body and joint pains." P's Ex. 1, ¶ 5. But, the testimony was also that during this very period she applied for and began work at a fast food restaurant. Tr. at 119-20. That job involved significant standing on her feet and continuous use of hands as Petitioner cleaned the dining room, worked the cash register and filled orders at the drive-thru at various times. Tr. at 28-29, 119-20. Given the physical requirements of the job, it is inconceivable that Petitioner would have sought such work at a time when she was suffering to the extent as described in the testimony.

---

[11] She said she was running long distances and that, as a result, everything hurt. *Id.* She explained that she had maintained a running journal so that she could track what she ate and each of her runs. *Id.* However, when asked to produce it, Petitioner promptly stated she had destroyed it.

In sum, there is no doubt that Petitioner has clearly suffered pain as she vividly described. Both her parents verified this. But having endured such pain for at least a few years to the point where she kept a "pain" journal, it is reasonable that Petitioner perceived that the pain began much earlier and has been ongoing much longer than in actuality. Even Petitioner and her parents inherently recognize this because they all testified that during the 2007 time period up until the March-April 2008 time frame no pains were significant to them. Petitioner, who was diligent and sensitive to aches and pains in her body, recognized when she experienced pain and sought medical attention, that being in March-April 2008.

The special master does not credit Petitioner's testimony regarding the timing of onset of pains following receipt of the vaccine, as being earlier than March-April 2008. The contemporaneous medical records are clear and consistent and, thus, should be and are accorded great weight. *Curacus,* 993 F.2d at 1528. The special master's assessment of the testimony and demeanor leads the special master to find that the medical records are more reliable and credible than the testimony regarding aches and pains not reflected in the records. *See Andreu.,* 569 F.3d at 1379 (an assessment of a fact witness's credibility may involve consideration of the person's demeanor while testifying).

Based on the entire record, the special master finds that Petitioner's first aches and pains and swelling of joints following her receipt of the HPV vaccines were the pains and joint swelling relating to her knee reported to have begun a few weeks before April 18, 2008.

## V. FINDING OF FACT

Accordingly, the special master, in the exercise of her discretion, makes the following finding of fact:

1. Petitioner's onset of joint pain following her receipt of HPV vaccinations on June 27, 2007, August 26, 2007 and January 4, 2008, occurred somewhere between March and April 2008, in the few weeks prior to April 18, 2008, when she first visited her doctor complaining, *inter alia*, of pain to her left knee.

## VI. CONCLUSION

The special master hereby enters this finding of fact. The special master makes no conclusion as to the significance of this in the context of Petitioner's claim.

**IT IS SO ORDERED.**

/s/ Daria J. Zane
Daria J. Zane
Special Master

/

20